UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JENIFER DUPRES, WILLIAM SOTO,
DOMINGO TOLENTINO, and LUIS VIRUET,
individually and on behalf of all persons similarly
situated,

Plaintiffs,

-against-

HOUSLANGER & ASSOCIATES, PLLC,
TODD HOUSLANGER, and BRYAN BRYKS,

Defendants.

**No. 16 Civ. 6691**

**CLASS ACTION
COMPLAINT**

**DEMAND FOR JURY TRIAL**

## PRELIMINARY STATEMENT

1.      Named Plaintiffs and hundreds of putative Class Members bring this action to

challenge the unlawful scheme operated by Defendants Houslanger & Associates, PLLC, a debt

collection law firm, and Todd Houslanger and Bryan Bryks, two attorneys at that firm, to extract

money from consumers by improperly executing on old New York City Civil Court judgments.

In doing so, Defendants systematically flout consumer protections in order to enrich themselves

at the expense of Named Plaintiffs and the Class.

2.      Domingo Tolentino was going about his life when, out of nowhere, he received an

income execution from Defendants that threatened to garnish his paycheck. The execution was

from a law firm he had never heard of, on behalf of a company he had never heard of, to collect

on a purported judgment issued in a case against him *more than ten years earlier* that he had

never heard of, brought by a different company he had never heard of, and in which he had never

been served.

1

3.     Defendants' practices in preparing the executions were improper and unlawful in numerous respects, though Mr. Tolentino had no way of knowing that at the time. Through his own tenacity and with the eventual assistance of counsel, Mr. Tolentino fought for thirteen months, during which he went to court five times (missing work each time), and was eventually able to stop the execution.

4.     The same thing happened to Jenifer Dupres, William Soto, Luis Viruet, and to many other Class Members. Although all were able to eventually prevail by showing that they were never served and the judgments were unlawfully obtained, all expended time and money for which they were never recompensed. Other putative Class Members were not as fortunate, and have paid over money that Defendants should never have collected.

5.     Defendants' formula for extracting money from New York City consumers involves the following steps: First, the judgment buyers they represent purchase old judgments on allegedly unpaid consumer debt. The judgments they buy were obtained years, if not decades ago, by debt buyers—companies that buy debt from original creditors. These judgment buyers buy the judgments on the cheap, because the judgments are almost always legally flawed and of questionable collectability; it is well-documented that New York City Civil Court judgments won by debt buyers are often based on "sewer service" (that is, fake service), and on the basis of insufficient proof.

6.     Defendants acquire virtually no documentation in connection with these judgments: not the affidavits of service in the underlying litigation, not documentation substantiating the judgments' chain of title, not the case file, and often not even the judgments themselves.

7.      Then, Defendants proceed to execute on the judgments against Class Members, violating laws designed to protect consumers at every turn:

- They execute without conducting any meaningful attorney review (they have virtually no documents to review);

- They fail to send any legally required notices;

- They needlessly prolong legal proceedings, even when confronted with incontrovertible evidence that their collection is improper, in order to wear down Class Members;

- They make misrepresentations to the court and to Class Members;

- They extract settlements that include provisions designed to insulate them from liability for their misconduct; and

- They often refuse to return Class Members' funds even when court-ordered to do so.

Most Class Members eventually give up. And in this way, Defendants are able to turn the poorest quality judgments, many of which were unlawfully obtained, into lucrative collections for themselves and their clients.

8.      Defendants' conduct is ongoing and harms additional Class Members every day.

9.      Named Plaintiffs and putative class representatives Jenifer Dupres, William Soto, Domingo Tolentino, and Luis Viruet ("Named Plaintiffs") bring this action on behalf of themselves and a Class consisting of individuals against whom Defendants executed on judgments obtained in New York City Civil Court on behalf of a judgment creditor that did not originally obtain the judgment.

10.     Named Plaintiffs allege that Defendants' practices violate the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*. (the FDCPA), New York General Business Law § 349, and New York Judiciary Law § 487. They bring this action to seek redress for themselves and hundreds of similarly situated Class Members victimized by Defendants' conduct.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over Named Plaintiffs' federal claim pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692k(d), and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201(a) and 2202.

12.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because it is the district where a substantial part of the events giving rise to Plaintiffs' claims occurred—namely, it is the district in which Defendants issued income executions to Ms. Dupres and Mr. Viruet and the district in which Defendants filed and litigated lawsuits against Ms. Dupres and Mr. Viruet.

## PARTIES

13.     Named Plaintiff Jenifer Dupres is a natural person residing in Queens, New York.

14.     Named Plaintiff William Soto is a natural person residing in the Bronx, New York.

15.     Named Plaintiff Domingo Tolentino is a natural person residing in Teaneck, New Jersey.

16.     Named Plaintiff Luis Viruet is a natural person residing in Brooklyn, New York.

17.     Each Plaintiff is a "consumer" as that term is defined by the FDCPA, 15 U.S.C. § 1692a(3), in that each Plaintiff was alleged to owe a debt stemming from an unpaid balance on a consumer account.

18.     Defendant Houslanger & Associates, PLLC ("H&A") is a domestic professional service limited liability company organized under the laws of the State of New York with its principal place of business located at 372 New York Ave., Huntington, New York 11743.

4

19.     H&A is a debt collection law firm that specializes in judgment enforcement. H&A is registered as a debt collection agency with the New York City Department of Consumer Affairs, with license number 2033286-DCA.

20.     H&A engages in efforts to collect debt from approximately 5,000 New York City consumers each year.

21.     Defendant Todd Houslanger ("Houslanger") is a natural person and a member of the New York Bar. He is a debt collection attorney and the managing attorney at H&A. He has held leadership roles in trade associations for debt collection lawyers, including the Consumer Credit Association of Metropolitan New York, the Creditor's Rights Law Committee of the Suffolk County Bar Association, and the Commercial Lawyers Conference Collection Bar.

22.     Defendant Bryan Bryks ("Bryks") is a natural person and a member of the New York Bar. At all relevant times, Bryks was a debt collection attorney and a member of the law firm H&A, and was registered with the New York State bar as a member of H&A.

23.     Defendants are all "debt collectors" as defined by the FDCPA, 15 U.S.C. § 1692a(6), in that Defendants regularly use the instrumentalities of interstate commerce in their businesses, the principal purpose of which is the collection of debts, and are engaged in the business of collecting consumer debts via various means, including wage garnishment, bank restraint and levy, and civil debt collection lawsuits.

**PROCEDURAL HISTORY**

24.     On April 18, 2019, Eduardo Burkett, Guillaume Foss, Virginia Ortiz filed this same proposed class action, against the same Defendants named here, under the caption *Burkett v. Houslanger & Associates*, No. 19 Civ. 2285 (LDH)(JO) (E.D.N.Y.).

25.     After Mr. Burkett, Mr. Foss, and Ms. Ortiz accepted Offers of Judgment made by Defendants under Federal Rule of Civil Procedure 68, Mr. Burkett, Mr. Foss, and Ms. Ortiz, along with Lakesha Kingdom (collectively, "Original Proposed Class Representatives"), filed the First Amended Complaint in *Burkett v. Houslanger & Associates*, which is attached hereto as Exhibit A.

26.     After Ms. Kingdom accepted an Offer of Judgment made by Defendants under Federal Rule of Civil Procedure 68, Named Plaintiffs timely sought to bring their claims and to represent the class in *Burkett v. Houslanger & Associates*. However, in orders dated November 22, 2019 and November 26, 2019 (today), leave was denied.

27.     Accordingly, Named Plaintiffs are filing this action immediately to assert their claims and the claims of the putative class.

## FACTUAL ALLEGATIONS

28.     Defendants are debt collection attorneys who have garnished the wages and restrained the bank accounts of hundreds of New York City consumers on behalf of their judgment buyer clients.  In the course of these collections, Defendants systematically engaged in unlawful conduct and violated numerous protections put in place to protect consumers.

29.     Defendants represent judgment buyers: entities that purchase New York City Civil Court judgments for a fraction of their face value.

30.     The companies that originally obtained these judgments were themselves debt buyers: entities that purchased debts, often for pennies on the dollar, and attempted to collect on those debts for profit.

31.     Many of the debt buyers that obtained judgments against Class Members are now defunct.

32.     The New York State Unified Court System has documented that many debt buyers unlawfully obtained judgments "on the basis of insufficient or incorrect factual proof or hearsay testimony" and "sewer service," the practice of failing to lawfully serve a summons and complaint and then filing a fraudulent affidavit of service.[1]

33.     The judgment buyers represented by Defendants bought judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, the Original Proposed Class Representatives, and members of the putative Class. The judgment buyers purchased these judgments either from the debt buyers that originally obtained the judgments or, more often, from other judgment buyers.

34.     Thus, at the time Defendants executed on judgments against Class Members, each obligation had been sold at least twice (from the original creditor to the debt buyer, and from the debt buyer to the judgment buyer).

35.     When Defendants executed against Mr. Viruet, for example, his obligation had been sold at least four times.

36.     On information and belief, the obligations of many Class Members were sold multiple times.

37.     The judgment against Mr. Viruet on which Defendants executed was issued in 2003, the judgment against Mr. Soto was issued in 2004, the judgment against Mr. Tolentino was issued in 2006, and the judgment against Ms. Dupres was issued in 2007. The alleged debts underlying them were years older.

38.     The judgments against the Original Proposed Class Representatives and the Class Members on which Defendants executed were also many years old. Most were obtained between

---

[1] N.Y. Unified Court Sys., *NY System Adopts New Rules to Ensure a Fair Legal Process in Consumer Debt Cases* (Sept. 16, 2014), *available at* http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/PR14_06.pdf.

approximately 2002 and 2008. The purported debts underlying the judgments were even older. Most were purportedly incurred in the 1990s and early 2000s.

39.     Defendants did not represent the debt buyers who obtained the judgments. The debt buyers were represented by other counsel. Many of those law firms are now defunct.

40.     On information and belief, Defendants were and continue to be compensated for their collection activity by retaining a portion of funds collected.

41.     Defendants have engaged in their unlawful conduct knowingly and willfully.

42.     Defendants' conduct is ongoing, and will continue absent court intervention.

**A. Defendants Executed on Judgments with Virtually No Documentation or Attorney Review**

43.     Defendants executed on the judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, the Original Proposed Class Representatives, and the Class Members by wage garnishment or bank account restraint/levy. *See* N.Y. C.P.L.R. §§ 5222 (bank restraint), 5231 (garnishment), 5232 (levy).

44.     Executions are issued by attorneys in their role as "as officer[s] of the court." *See id.* §§ 5222(a), 5230(b).

45.     To execute by wage garnishment, Defendants issued an income execution, and sent it to the New York City marshal, who was required to serve it on the consumer. *See id.* § 5231(b), (d).

46.     To execute by bank restraint (which freezes a consumer's bank account), Defendants issued a restraining notice, and sent it to the Class Member's bank, which was required to serve it on the consumer. *See id.* §§ 5222(a), (d), 5222-a(b). On information and belief, in some cases Defendants later issued a levy on the bank account (which withdraws funds from the consumer's account). *See id.* § 5232.

47.     On information and belief, Defendants reviewed virtually no documentation and engaged in no meaningful attorney review before issuing income executions against Ms. Dupres, Mr. Tolentino, and Mr. Viruet. On information and belief, Defendants reviewed virtually no documentation and engaged in no meaningful attorney review before issuing a restraining notice against Mr. Soto.

48.     On information and belief, Defendants reviewed virtually no documentation and engaged in no meaningful attorney review before issuing income executions and bank restraints against the Original Proposed Class Representatives and the Class Members.

49.     Specifically, on information and belief, Defendants did not review, for Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, the Original Proposed Class Representatives, and the Class Members: (a) a copy of the judgment Defendants were purporting to enforce; (b) an affidavit of service attesting to proper service in the underlying lawsuit; (c) documentation of the chain of title establishing that the judgment buyer owned the judgment; and/or (d) any contents of the case file of the underlying lawsuit.

50.     On information and belief, the judgment buyers that Defendants represented did not obtain copies of some or all of these documents when they purchased the judgments; Defendants did not otherwise obtain these documents; and Defendants thus did not possess them at the time Defendants executed.

51.     First, on information and belief, Defendants did not review the judgments entered against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet before executing on those judgments as "officer[s] of the court."

52.     On information and belief, Defendants did not review the judgments against the Original Proposed Class Representatives and the Class Members before executing on those judgments as "officer[s] of the court."

53.     Without reviewing the judgments, Defendants routinely issued income executions and bank restraints against Class Members which were based on facially invalid judgments or which contained other errors, such as stating an incorrect judgment amount.

54.     For example, Defendants issued an income execution against Mr. Viruet based on a judgment amount that exceeded the actual amount of the judgment against him.

55.     Second, Defendants did not review the affidavits of service filed in the underlying lawsuits against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

56.     Defendants did not review the affidavits of service filed in the underlying lawsuits against the Original Proposed Class Representatives and, on information and belief, in the lawsuits against Class Members.

57.     Without reviewing the affidavits of service, they often executed on judgments— including those against Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, and the Original Proposed Class Representatives—that were obtained through "sewer service" and were thus invalid.

58.     In many instances, reviewing the affidavits of service filed in the cases underlying the judgments would have revealed that service was facially improper.

59.     For example, the affidavit of service filed in a case against Original Proposed Class Representative Mr. Foss purported to serve process in a *different case*, brought by a *different debt buyer*.

10

60.     In other instances, review of the affidavits of service filed in the cases underlying the judgments would have created a strong inference that service was improper.

61.     For example, the now-defunct law firm that represented the debt buyers in the underlying cases against Ms. Dupres, Mr. Soto, and Mr. Tolentino, as well as Original Proposed Class Representatives Mr. Burkett, Ms. Ortiz, and Ms. Kingdom, was sued in a class action for systematically engaging in sewer service and entered a $59 million settlement. *See Sykes v. Mel S. Harris & Associates, LLC*, 757 F. Supp. 2d 413 (S.D.N.Y. 2010).

62.     In another example, the process server who purported to serve Ms. Dupres, as well as Original Proposed Class Representative Ms. Ortiz, was sued in that same class action. Eventually, the New York City Department of Consumer Affairs denied the renewal of his process serving license, explaining that his repeated violations demonstrated that he "lack[ed] the integrity, honesty, and fair dealing required of" licensed process servers. The process server who purported to serve process on Mr. Tolentino was also sued in the same class action, and the process server who purported to serve process on Mr. Viruet was also permanently banned from serving process in New York City due to documented violations.

63.     Third, on information and belief, Defendants did not review documentation establishing that Defendants or the judgment buyers they represented had the authority to execute on the judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

64.     On information and belief, Defendants did not review documentation establishing that Defendants or the judgment buyers they represented had the authority to execute on the judgments against the Original Proposed Class Representatives and the Class Members.

65.     On information and belief, to the extent Defendants reviewed any such documentation, that documentation was insufficient to establish that Defendants or the judgment buyers they represented had the authority to execute on the judgments.

66.     Fourth, Defendants did not review any of the documents contained in the case file of the lawsuits underlying the judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

67.     Defendants did not review any of the documents contained in the case files of the lawsuits underlying the judgments against the Original Proposed Class Representatives and, on information and belief, the lawsuits against Class Members.

68.     Defendants did not obtain the case files from their judgment buyer clients or from prior counsel. Nor did Defendants take other steps to obtain them.

69.     The New York City Civil Court maintains case files over three years old (up to twenty-five years old) in the city's archive for off-site storage. It takes approximately ten weeks for a requested archived file to become available for inspection. Any person can request an archived case file for free at any time.

70.     On information and belief, Defendants never requested case files before executing on judgments.

71.     Defendants thus executed without knowing whether documents in those files showed that the judgments or the executions were improper, or created a strong inference that the judgments or executions were improper.

72.     On information and belief, Defendants did not review whether the case files contained documents showing that the judgment had been satisfied; documents reflecting

litigation activity following the entry of the judgments; prior notices of assignment of judgment; and prior change of attorney forms.

73.     For example, if Defendants had reviewed the case file in the case against Mr. Viruet, they would have learned that the file did not contain proper authorization for them to proceed as substitute counsel for the judgment buyer.

74.     Likewise, on information and belief, Defendants did not review the applications for default judgment submitted by the debt buyers that brought the lawsuits. In many instances, a review of the applications for default judgment by the debt buyers would have revealed that the judgments were obtained on the basis of insufficient proof.

75.     For example, if Defendants had reviewed the applications for default judgment in the cases against Original Proposed Class Representative Mr. Foss, they would have learned that the supporting affidavits were facially invalid because they were not notarized correctly.

76.     Defendants have been sued numerous times for issuing income executions and bank restraints without conducting meaningful attorney review. *See Balthazar v. Houslanger & Associates, PLLC et al.*, No. 16-cv-04982, 2018 WL 3941943 (E.D.N.Y. Aug. 16, 2018), *Levy v. Platinum Financial Services Corp. et. al.*, No. 18-cv-06936 (E.D.N.Y Dec. 5, 2018), *Musah v. Houslanger & Associates, PLLC*, 962 F. Supp. 2d 636 (S.D.N.Y. 2013*), Stinson v. Houslanger & Associates PLLC et al.*,  No. 18-cv-11350 (S.D.N.Y 2018), *Sanders v. Houslanger and Associates, PLLC*, No. 17-cv-8985 (S.D.N.Y 2017), *Olajide, et al. v. Palisades Collection, LLC et al.*, 15-cv-07673 (S.D.N.Y. 2015).

**B.  Defendants Did Not Send Any Notices Required By Law**

77.     Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, and the Original Proposed Class Representatives did not receive any notices that the law required Defendants to send.

Specifically, they did not receive (a) a notice of the assignment of judgment; (b) a change of attorney form; or (c) a notice of their rights to validate the debt.

78.     On information and belief, Defendants did not send any of these notices to Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, the Original Proposed Class Representatives, and the Class Members.

79.     Each time a judgment is assigned, the judgment buyer must file an assignment of judgment with the court, and serve a copy on the party against whom the judgment was entered. N.Y. C.P.L.R. § 5019(c). That party must receive actual notice of the assignment. *Id.*; *Tri City Roofers, Inc. v. Northeastern Industrial Park*, 461 N.E.2d 298, 299 (N.Y. 1984).

80.     Neither the judgment buyers nor Defendants filed with the court any assignments of judgment documenting the judgment buyers' purchase of the judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet, and the Original Proposed Class Representatives.

81.     Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, and the Original Proposed Class Representatives did not receive any assignments of judgment. On information and belief, neither the judgment buyers nor Defendants served assignments of judgment on Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet, and the Original Proposed Class Representatives.

82.      On information and belief, the judgment buyers and Defendants routinely failed to file with the court any assignments of judgment documenting the judgment buyers' purchase of the judgments against Class Members, and the judgment buyers and Defendants routinely failed to serve those documents on Class Members.

83.     Each time a new attorney appears in a case, he or she must file a change of attorney form and serve it on the opposing party. N.Y. C.P.L.R. § 321(b).

84.     Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, and the Original Proposed Class Representatives never received change of attorney forms.

85.     On information and belief, Defendants did not serve change of attorney forms on Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

86.     On information and belief, Defendants did not serve, and often did not file, changes of attorney forms on the Original Proposed Class Representatives and other Class Members.

87.     In its initial communication with a consumer, or within five days thereafter, each debt collector must send a "validation notice" that informs the consumer of certain legal rights, including to dispute the debt and to be provided with the name and address of the original creditor. 15 U.S.C. § 1692g(a).

88.     Ms. Dupres, Mr. Soto, Mr. Tolentino, Mr. Viruet, and the Original Proposed Class Representatives never received validation notices from Defendants or the judgment buyers.

89.     On information and belief, Defendants did not send validation notices to Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

90.     On information and belief, Defendants did not send validation notices to the Original Proposed Class Representatives or to the Class Members.

91.     Receipt of the assignment of judgment, the change of attorney form, or the validation notice would have alerted Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet to the existence of the lawsuits and judgments against them and to the identities of the entities attempting to collect on the judgments.

92.      Defendants have been sued multiple times for failing to file and serve assignments of judgment and notices of change of attorney forms, and for failing to send

validation notices. *See Balthazar*, 2018 WL 3941943, *Levy* (E.D.N.Y Dec. 5, 2018), *Musah* (S.D.N.Y. 2013), *Stinson* (S.D.N.Y 2018), *McCrobie v. Palisades Acquisition XVI, LLC et al.*, No. 15-cv-00018 (W.D.N.Y. 2015), *Okyere v. Palisades Collection, LLC et al.*, No. 12-cv-01453 (S.D.N.Y 2012).

**C. When Named Plaintiffs and Class Members Challenged the Executions, Defendants Filed Deceptive Court Documents**

93.     Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet were never served in the lawsuits underlying the judgments on which Defendants executed, were never notified of the judgments against them, and never received notices of assignment or other notices regarding the judgments. As a result, Ms. Dupres, Mr. Tolentino, and Mr. Viruet first learned about the judgments and the underlying lawsuits when they received income executions issued by Defendants, and Mr. Soto first learned about the judgment and the underlying lawsuit when he learned his bank account had been restrained by Defendants.

94.     When they received the income executions, Ms. Dupres, Mr. Tolentino, and Mr. Viruet did not recognize the name of the debt buyer that obtained the judgments against them, the name of the judgment buyer, or Defendants; did not understand why or how they had been sued; and did not initially know what steps to take to stop the executions. When he learned his bank account had been restrained, Mr. Soto did not recognize the name of the debt buyer that obtained the judgment against him, the name of the judgment buyer, or Defendants; did not understand why or how he had been sued; and did not initially know what steps to take to stop the execution.

95.     Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet believe that they never owed the debts allegedly underlying the lawsuits and the judgments against them.

16

96.     The Original Proposed Class Representatives likewise were not properly served, did not receive any notices regarding the judgment, and first learned about the judgments and the underlying lawsuits against them when they received income executions or bank restraints issued by Defendants. The Original Proposed Class Representatives did not recognize the name of the debt buyer that obtained the judgments against them, the name of the judgment buyer, or Defendants; did not understand why or how they had been sued; and did not initially know what steps to take to stop the executions.

97.     On information and belief, because most if not all Class Members were never properly served in the lawsuits underlying the judgments on which Defendants executed, were never notified of the judgments against them, and never received notices of assignment or other notices regarding the judgment, they too first learned about the judgments and the underlying lawsuits when they received income executions or bank restraints issued by Defendants.

98.     On information and belief, most if not all Class Members did not recognize the name of the debt buyer that obtained the judgment against them, the name of the judgment buyer, or Defendants; did not understand why or how they had been sued; and did not initially know what steps to take to stop the execution.

99.     For example, seeking to understand the income execution she received, Original Proposed Class Representative Ms. Ortiz contacted Defendants. Defendants asked her to settle for the full judgment amount. Ms. Ortiz rejected the offer.

100.    On information and belief, some Class Members in this position were unable to determine any steps to take to stop the garnishment or restraint. Others contacted Defendants to inquire about the income execution or bank restraint, and accepted settlement offers. As a result,

Defendants were able to seize the funds of these Class Members on the basis of improper executions.

101.    Consumers who want to stop wage garnishment or bank restraint/levy may move to vacate the judgment in the Civil Court that issued it. *See* N.Y. C.P.L.R. § 5015(a). In New York City Civil Court, a Motion to Vacate the Judgment ("Motion to Vacate") is typically brought by order to show cause.  Consumers who were not served in the underlying lawsuit can challenge the execution by filing a Motion to Vacate for lack of personal jurisdiction. *See* N.Y. C.P.L.R. §§ 5015(a)(4); 3211(a)(8).

102.    Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet filed Motions to Vacate for lack of personal jurisdiction, acting *pro se*.

103.    The Original Proposed Class Representatives likewise filed such motions *pro se*. On information and belief, many Class Members filed such motions, and virtually all did so *pro se*.

104.    In response to Ms. Dupres's, Mr. Soto's, Mr. Tolentino's, and Mr. Viruet's Motions, as well as the Motions of the Original Proposed Class Representatives, Bryks, on behalf of H&A, filed and served a standard form Affirmation in Opposition ("Opposition") to the Motions.

105.    Bryks signed these Oppositions under penalty of perjury.

106.    The Oppositions contained boilerplate language and were virtually identical to one another, except for identifying details (for example, the individual's name and the alleged amount of debt owed) and certain dates.

107.    Under New York law, a judgment creditor's "opposition to a motion based on improper service shall contain a copy of the proof of service." *Id.* § 3211(e).

18

108.    The Oppositions in the cases against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet did not contain an affidavit of service. The Oppositions against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet stated that "[a] copy of the Affidavit of Service is unavailable to be attached to this opposition."

109.    The Oppositions did not contain any facts regarding service, such as how or when Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet were allegedly served.

110.    Nonetheless, the Oppositions against Ms. Dupres, Mr. Tolentino, and Mr. Viruet stated that "[u]pon information and belief, the [consumer] was properly served in this matter."

111.    This statement was false. Ms. Dupres, Mr. Tolentino, and Mr. Viruet were not properly served.

112.    The Opposition in the case against Mr. Tolentino did not contain a copy of the judgment. The Opposition stated that "[a] copy of the Judgment is unavailable to be attached to this opposition."

113.    Each Opposition stated that "[a]ny and all restraints of bank accounts . . . or garnishment of wages, resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

114.    This statement was false. The judgments against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet were not lawfully obtained, due to improper service and/or insufficient proof. The executions were not proper, because, among other things, Defendants had no proof of the chains of title, and had not sent the required notices.

115.    The Oppositions further stated that the judgment buyers represented by Defendants were the "successor[s]" to the debt buyers that originally obtained the judgments.

116.    The Oppositions attached documents purporting to establish that Defendants and the judgment buyers they represented had the authority to execute on the judgments.

117.    These documents were insufficient to establish that Defendants and the judgment buyers they represented had the authority to execute on the judgments.

118.    For example, Bryks attached to the Opposition to Ms. Dupres's Motion to Vacate only a document that purported to assign the underlying debt from two random companies—but not the company that sued Ms. Dupres. This document was insufficient to establish ownership of the debt.

119.    Each of Bryks's representations in the Oppositions was made without a reasonable basis and without having undertaken any investigation that could have led to a good faith belief in its truth.

120.    Bryks filed and served virtually identical Oppositions in the cases against the Original Proposed Class Representatives and, on information and belief, in other cases in which Class Members filed Motions to Vacate, each of which contained the same representations described above.

121.    On information and belief, all of these representations were made without a reasonable basis and without an investigation that could have led to a good faith belief in their truth, and many of them were false.

122.    Defendants' filing of Oppositions without a good faith basis to do so had the effect of unduly prolonging legal proceedings against Class Members.

**D.  Defendants Unduly Prolonged Legal Proceedings**

123.    Defendants unduly prolonged the legal proceedings against Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet. On information and belief, Defendants did so to induce those

individuals to drop their challenges to the executions or enter settlements favorable to Defendants.

124.    Defendants refused to vacate judgments even after Ms. Dupres, Mr. Soto, and Mr. Viruet presented them with overwhelming evidence that their executions were improper and the judgments invalid.

125.    Defendants also refused to vacate judgments after the Original Proposed Class Representatives presented them with overwhelming evidence that their executions were improper and the judgments invalid.  For example, Original Proposed Class Representative Mr. Burkett presented eight pieces of proof that he was not served.

126.    Defendants' actions, including their refusal to vacate judgments, resulted in Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet having to attend multiple court dates over the span of many months. For example, Mr. Tolentino attended five court dates, spanning nearly a year.

127.    The court ultimately vacated the judgments and dismissed the cases against Mr. Soto, Mr. Tolentino, and Mr. Viruet, and the Original Proposed Class Representatives.

128.    Defendants unduly prolonged the legal proceedings against the Original Proposed Class Representatives and, on information and belief, the proceedings against the Class Members, through similar conduct.

129.    On information and belief, Defendants' unlawful conduct caused many Class Members to drop their challenges to Defendants' executions or enter settlements favorable to Defendants.

130.    Defendants have been repeatedly sued for unduly prolonging legal proceedings in the face of overwhelming evidence. *See Levy* (E.D.N.Y Dec. 5, 2018), *Stinson* (S.D.N.Y 2018), *Okyere* (S.D.N.Y 2012), *Sanders* (S.D.N.Y 2017), *Olajide* (S.D.N.Y. 2015).

### E.  Defendants Sought Deceptive Releases Designed to Insulate Them from Liability

131.    Defendants sought Ms. Dupres's and Mr. Tolentino's agreement to a Stipulation (the "Stipulation") that contained a release of potential claims (the "Release") in exchange for Defendants' agreement to cease execution and vacate the judgments against them.

132.    Defendants designed the Release to insulate them from liability for their unlawful conduct.

133.    Specifically, the Release stated that the consumer would:

release and forever discharge [the judgment buyer], [the debt buyer], [the original creditor], Houslanger & Associates, PLLC, its former, present and future parents, subsidiaries and/or affiliates, whether direct or indirect, and any and all former, present and future officers, directors, employees, representatives, predecessors, successors, agents, attorneys, independent contractors or assigns from any and all claims, demands, liabilities, damages, losses or expenses relating to the account and attempts to collect same, including any and all alleged improper debt collection acts, including claims alleged to be based upon federal FDCPA and/or other New York laws which may govern the collection of debts, from the beginning of time to the date of execution of this agreement by all parties.

134.    The Stipulation also typically stated that "any sums previously [collected], if any, may be retained by" Defendants.

135.    Defendants sought some of the Original Proposed Class Representatives' and, on information and belief, many of the Class Members' agreement to the Release as a condition of ceasing execution and vacating judgments against them.

136.    Defendants have been sued for seeking Releases in an attempt to insulate themselves from liability for their unlawful conduct. *See Levy* (E.D.N.Y Dec. 5, 2018), *Stinson* (S.D.N.Y 2018), *Olajide* (S.D.N.Y. 2015).

**F.  Defendants Withheld Funds They Were Ordered to Return**

137.    On information and belief, Defendants routinely refused to comply with judicial orders to return funds to Class Members.

138.    Defendants were ordered to return all funds collected pursuant to judgments against two of the Original Proposed Class Representatives, *see* N.Y. C.P.L.R. § 5015(d), but refused to comply with these orders. For example, Mr. Foss had to wait over six months and engage in extensive advocacy to receive his funds.

139.    Defendants have been sued in the past for failing to return funds to consumers as ordered. *See Okyere* (S.D.N.Y 2012).

**G.  Defendants' Conduct Caused Harm to Named Plaintiffs and Class Members**

140.    Defendants' unlawful activities harmed Ms. Dupres, Mr. Soto, Mr. Tolentino, and Mr. Viruet.

141.    Defendants' unlawful activities harmed the Original Proposed Class Representatives and hundreds of Class Members.

142.    These harms included, but were not limited to: deprivation of funds (temporary or permanent) due to garnished wages, restrained or levied bank accounts, or settlements; time and money spent to appear at multiple court dates and otherwise challenge the executions, including lost wages due to missed work, postage, photocopying, transportation, and childcare; and actual and emotional damages.

143.    Defendants' actions are ongoing and will cause further harm to Class Members absent Court intervention.

## FACTS CONCERNING NAMED PLAINTIFFS

*Jenifer Dupres*

144.    Plaintiff Jenifer Dupres is a fifty-five year old resident of Queens, New York. Ms. Dupres works for the New York City Department of Education as a bus monitor.

145.    On or after May 25, 2018, Ms. Dupres received her paycheck for the week of May 14, 2018. She saw that $52.00 had been garnished from her paycheck. She was not otherwise notified about the garnishment by her employer and did not know why her wages had been garnished.

146.    A few months earlier, on February 13, 2018, Houslanger issued an income execution to New York City Marshal Ronald Moses, who then sent a Notice of Garnishment to an address where Ms. Dupres had not lived for fifteen years.

147.    The documents stated that Ms. Dupres owed $5,115.70, plus over $5,000 in interest and fees, to satisfy a judgment in *Rushmore Recoveries XIV, LLC. v. Jenifer Dupres* ("*Rushmore XIV v. Dupres*"), Index Number 62338-07/QU, in New York City Civil Court, Queens County.

148.    The income execution stated that the debt was owed to Virgo Capital, LLC ("Virgo"). The income execution was signed by Houslanger.

149.    Ms. Dupres had never heard of *Rushmore XIV v. Dupres*. She was never served with a summons and complaint in that action. She had no other notice of the action or the judgment, and never received an assignment of judgment, a change of attorney form, or a validation notice. Ms. Dupres had never heard of Virgo, Rushmore Recoveries XIV, LLC ("Rushmore XIV"), or Defendants.

150.    Unbeknownst to Ms. Dupres, Rushmore XIV had filed *Rushmore XIV v. Dupres*

against her on May 22, 2007, as an assignee of an alleged credit card debt from First USA Bank.

151.    The law firm Mel S. Harris and Associates, LLC represented Rushmore XIV in *Rushmore XIV v. Dupres*.

152.    On August 15, 2007, a default judgment was entered against Ms. Dupres in the amount of $5,115.70.

153.    In support of its application for default judgment, Rushmore XIV submitted an affidavit of service in which process server Michael Mosquera swore that he served Ms. Dupres on June 1, 2007, at Ms. Dupres's residence at 11457 118th Street, South Ozone Park, New York 11420 ("11457 118th Street") by delivering the papers to a "Mr. Reginald," a "Male with Black hair and Black skin, 21-35 years old, 5'9"-6'0"", 161-200 Lbs, had a mustache."

154.    However, Ms. Dupres did not live at 11457 118th Street on June 1, 2007. She moved out of that address in 2005. In 2007, her sisters and her mother still lived at that address with her young nephews, the oldest of whom was nine years old. No one named "Mr. Reginald," no adult men, and no individuals with black skin lived at 11457 118th Street at the time of alleged service.

155.    According to Defendants, the *Rushmore XIV v. Dupres* judgment was sold from Rushmore XIV at some point, and eventually was owned by Virgo.

156.    No assignments of judgment were filed in *Rushmore XIV v. Dupres*.

157.    On information and belief, Virgo retained H&A to execute on the judgment.

158.    On February 13, 2018, Houslanger issued the income execution that led to the garnishment of Ms. Dupres's wages.

159.    On information and belief, before issuing the income execution, neither Houslanger nor anyone at H&A possessed or reviewed the *Rushmore XIV v. Dupres* affidavit of

service, documents establishing a chain of title for the judgment, or the case file.

160.  Ms. Dupres first learned about the existence of *Rushmore XIV v. Dupres* on or after May 25, 2018, when she learned that her wages had been garnished.

161.  On June 12, 2018, Ms. Dupres filed in Queens Civil Court a *pro se* Motion to Vacate the *Rushmore XIV v. Dupres* judgment. She also filed accompanying paperwork stating that this was not her debt, that she never received anything in the mail about the case, and that she "kn[e]w nothing" about it. Ms. Dupres could not review any documents in the court file because it was being held in the archive.

162.  On June 21, 2018, the first court date for Ms. Dupres's motion, Bryks filed and served an Opposition to Ms. Dupres's Motion, sworn under penalty of perjury.

163.  On information and belief, neither Bryks nor anyone at H&A possessed or reviewed the affidavit of service, the documents establishing chain of title, or the case file in *Rushmore XIV v. Dupres* prior to filing the Opposition.

164.  The Opposition did not attach the affidavit of service. In the Opposition, Bryks stated that "[a] copy of the Affidavit of Service is unavailable to be attached to this opposition." The Opposition did not contain any specific facts regarding service, such as how or when Ms. Dupres was allegedly served.

165.  Nonetheless, in the Opposition, Bryks stated that "[u]pon information and belief, [Ms. Dupres] was properly served in this matter."

166.  This representation was false. Ms. Dupres was never served.

167.  In the Opposition, Bryks stated that "[a]ny and all . . . garnishment of wages[] resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

168.    This representation was false. The judgment was not lawfully obtained, because Ms. Dupres was never served. The execution was not proper, because, among other things, Defendants had no proof of the chain of title, and had not sent the required notices.

169.    The Opposition further stated that Virgo was the "successor" to Rushmore XIV. In support of this statement, Bryks attached a purported assignment of Accounts between LR Credit LLC and Rushmore Recoveries Management, LLC—a different company than Rushmore XIV, which sued Ms. Dupres.

170.    The documents attached to the Opposition did not establish Virgo's or Defendants' authority to execute on the judgment.

171.    Each of Bryks's representations in the Opposition was made without a reasonable basis and without having undertaken any investigation that could have led to a good faith belief in their truth.

172.    Defendants unduly prolonged the legal proceedings against Ms. Dupres. On information and belief, Defendants did so to induce Ms. Dupres to drop her challenge to the execution or enter into a settlement favorable to Defendants.

173.    At her first court date, and her subsequent court dates, Mr. Dupres was represented by a limited-scope volunteer attorney through the New York City Civil Court's Volunteer Lawyer for a Day ("VLFD") program.

174.    *Rushmore XIV v. Dupres* was adjourned for a second court date.

175.    In May and June 2018, Ms. Dupres's employer garnished a total of $254.80 from her wages in connection with *Rushmore XIV v. Dupres*.

176.    On September 6, 2018, the second court date for Ms. Dupres's motion, *Rushmore XIV v. Dupres* was adjourned for a third court date.

177.    When the court file became available, Ms. Dupres learned that the affidavit of service contained an incorrect address, 11457 118th Street. Ms. Dupres, with the assistance of the Civil Legal Advice and Resource Office ("CLARO"),[2] which provides free assistance preparing court papers to *pro se* consumers, prepared and served a supplemental affidavit in support of her Motion to Vacate. Ms. Dupres attested that she did not live at the service address at the time of service because she had moved out in 2005, and that no one named Mr. Reginald or matching his description lived at the service address.

178.    Ms. Dupres attached to her supplemental affidavit multiple forms of proof showing that she did not live at the service address at the time of service, including: a notarized letter from the owner of the home that was the service address stating that Ms. Dupres did not live there in 2007 and that no one named Mr. Reginald or matching his description lived there, and a notarized letter from the landlord of the apartment Ms. Dupres moved into in 2005 stating that she lived there at the time.

179.    On October 10, 2018, the third court date for Ms. Dupres's motion, Bryks filed and served an Amended Opposition to Ms. Dupres's Motion, sworn under penalty of perjury.

180.    Bryks's Amended Opposition stated that "This matter was properly commenced against [Ms. Dupres] by service of a Summons and Complaint."

181.    This representation was false. The action was not properly commenced. Ms. Dupres was never served.

182.    In the Amended Opposition, Bryks again stated that "[a]ny and all . . . garnishment of wages[] resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

---

[2] *See* www.claronyc.org; *see also* N.Y. Unified Court Sys., *New York State Court Access to Justice Program*, *available at* http://www.nycourts.gov/ip/nya2j/.

183. This representation was false. The judgment was not lawfully obtained, because Ms. Dupres was never served. The execution was not proper, because, among other things, Defendants had no proof of the chain of title, and had not sent the required notices.

184. The Amended Opposition again attached the same purported assignment document between two companies, neither of which is the company that sued Ms. Dupres. This did not establish Virgo's or Defendants' authority to execute on the judgment.

185. On this same day, Ms. Dupres filed her supplemental affidavit.

186. On November 19, 2018, after reviewing Ms. Dupres's Motion to Vacate and supplemental affidavit, and Bryks's Opposition, the judge issued an order stating that Ms. Dupres had "controverted service" and ordering an evidentiary hearing, scheduled for December 17, 2018.

187. On or about December 14, 2018, Bryks called Ms. Dupres. Bryks told Ms. Dupres that she could sign paperwork that would end the case, so that she would not need to go back to court.

188. Bryks also told Ms. Dupres that if she did not sign the paperwork, she would have to go back to court every two weeks.

189. This statement was false. Ms. Dupres would not have to go back to court every two weeks if she did not sign the Stipulation.

190. At the time Bryks called Ms. Dupres, he knew that the process server, Michael Mosquera, was not able to appear at the scheduled evidentiary hearing. Bryks also knew that if Ms. Dupres attended the scheduled hearing and the process server did not appear, the judge would find in favor of Ms. Dupres and vacate the judgment and dismiss the case.

191. Bryks did not disclose this information to Ms. Dupres.

192.     Bryks did not tell Ms. Dupres that the paperwork he told her to sign contained a purported release of any claims she might have against Virgo, Rushmore, First USA Bank, and Defendants.

193.     On December 14, Bryks sent Ms. Dupres a Stipulation containing the Release, *supra*, ¶ 133.

194.     Ms. Dupres reviewed the Stipulation without the assistance of an attorney.

195.     In reliance on Bryks's false representations and material omissions, Ms. Dupres signed the Stipulation.

196.     Ms. Dupres did not understand the purported meaning of the language in the Release until months later, when she met with current counsel.

197.     The money garnished from Ms. Dupres's paycheck was finally returned to her in early 2019, more than six months after it had been taken.

198.     As a result of Defendants' actions, Ms. Dupres has experienced emotional and financial harm. Ms. Dupres spent time and money to appear at multiple court dates and otherwise challenge the execution, including for postage, transportation, and photocopying, among other expenses. She had to miss work each time she went to court or meetings, and lost wages each time. Ms. Dupres lost access to the garnished funds for more than six months. As a result of the garnishment and lost wages, Ms. Dupres had difficulty paying her utility bills. Ms. Dupres also experienced emotional distress; the sudden garnishment of her wages and the many court appearances made her feel very anxious. She thought about the lawsuit every day. Her anxiety was so concerning to her family members that they considered taking her to the doctor for treatment.

*William Soto*

199.    Plaintiff William Soto is a forty-five year old resident of the Bronx, New York. Mr. Soto works as a heavy maintenance worker at a university.

200.    On or about September 21, 2018, Defendants mailed an Information Subpoena and Restraining Notice ("Restraining Notice") to Capital One Bank directing Capital One to restrain funds in Mr. Soto's bank account.

201.    On information and belief, the Restraining Notice stated that Mr. Soto owed $5,198.06, plus nearly $7,000 in interest and fees, to satisfy a judgment in *Asta Funding Acquisition III, LLC v. William Soto* ("*Asta v. Soto*"), Index Number 109587-03/BX, in New York City Civil Court, Bronx County.

202.    Defendants sought to restrain $11,996.23 from Mr. Soto's bank account.

203.    On information and belief, the Restraining Notice stated that the debt was owed to Palisades Collection, LLC ("Palisades Collection"). On information and belief, the documents were signed by Houslanger.

204.    On October 16, 2018, Capital One responded to the Restraining Notice sent by Defendants. On or around that day, Capital One restrained $641.28 from Mr. Soto's account, meaning that Mr. Soto no longer could access those funds. The remainder of the funds in Mr. Soto's account were not restrained because they were protected under a law that shields a minimum balance in each bank account from freeze by creditors.

205.    Capital One charged Mr. Soto a $100 fee in connection with the restraint. Mr. Soto discovered the restraint on his bank account on or after October 16, 2018, when he noticed that a $100 fee has been imposed on his account, and then noticed that over $600 was missing from his account balance.

206.     Mr. Soto had never heard of *Asta v. Soto*. He was never served with a summons and complaint in that action. He had no other notice of the action or the judgment, and never received an assignment of judgment, a change of attorney form, or a validation notice. Mr. Soto had never heard of Palisades Collection, Asta Funding Acquisition III, LLC ("Asta"), or Defendants.

207.     Unbeknownst to Mr. Soto, Asta had filed *Asta v. Soto* against him on December 23, 2003, as an assignee of an alleged credit card debt from Providian Bank.

208.     The law firm Mel S. Harris & Associates, LLC represented Asta in *Asta v. Soto*.

209.     On February 23, 2004, a default judgment was entered against Mr. Soto in the amount of $5,198.06.

210.     In support of its application for default judgment, Asta submitted an affidavit of service in which process server Jose Rojas swore that he served Mr. Soto on December 13, 2003, by affixing a copy of the summons and complaint to the door of Mr. Soto's residence at 3439 Knox Place, Apartment 3C, Bronx, NY, 10467 ("3439 Knox") and mailing the summons and complaint to the same address.

211.     However, Mr. Soto did not live at 3439 Knox in December 2003. 3439 Knox was Mr. Soto's former address, where he had lived with his wife. But Mr. Soto no longer lived there in December 2003.

212.     The process server who claimed to have served Mr. Soto, Jose Rojas, was disciplined by the New York City Department of Consumer Affairs for violations of the regulations governing process servers, and fined for these violations.

213.     According to Defendants, the *Asta v. Soto* judgment was sold from Asta to Palisades Collection.

214. No assignments of judgment were filed in *Asta v. Soto*.

215. On information and belief, Palisades Collection retained H&A to execute on the judgment.

216. According to Defendants, on June 24, 2015, H&A issued an income execution to Mr. Soto in connection with *Asta v. Soto*. However, Mr. Soto did not learn of this income execution at the time, because the income execution was sent to a former employer, and the Notice of Garnishment was mailed to his father's former address after his father had passed away.

217. On or around October 16, 2018, Defendants issued the Information Subpoena and Restraining Notice that led to the restraint of Mr. Soto's bank account.

218. On information and belief, before issuing the Restraining Notice, neither Houslanger nor anyone at H&A possessed or reviewed the *Asta v. Soto* affidavit of service, documents establishing a chain of title for the judgment, or the case file.

219. On October 29, 2018, Mr. Soto filed in Bronx Civil Court a *pro se* Motion to Vacate the *Asta v. Soto* judgment, via order to show cause, but the judge declined to sign it.

220. On October 31, 2018, Mr. Soto returned to Bronx Civil Court and filed a second *pro se* Motion to Vacate the *Asta v. Soto* judgment (the "Motion to Vacate").

221. Mr. Soto also filed an affidavit stating that he was never served and that he first learned of the lawsuit when his bank account was restrained. Mr. Soto also stated that he had "no recollection of this debt." Mr. Soto could not review any documents in the court file because it was being held in the archive.

222. On November 21, 2018, the first court date for Mr. Soto's motion, Bryks filed and served an Opposition to Mr. Soto's Motion, sworn under penalty of perjury.

223.    On information and belief, neither Bryks nor anyone at H&A possessed or reviewed the affidavit of service, the documents establishing chain of title, or the case file in *Asta v. Soto* prior to filing the Opposition.

224.    The Opposition did not attach the affidavit of service. In the Opposition, Bryks stated that "[a] copy of the Affidavit of Service is unavailable to be attached to this opposition." The Opposition did not contain any specific facts regarding service, such as how or when Mr. Soto was allegedly served.

225.    The Opposition also stated that "[a]ny and all restraints of bank accounts . . . resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

226.    This representation was false. The judgment was not lawfully obtained, because Mr. Soto was never served. The execution was not proper, because, among other things, Defendants had no proof of the chain of title, and had not sent the required notices.

227.    The Opposition further stated that Palisades Collection was the "successor" to Asta. In support of this statement, Bryks did not attach any purported assignment documents.

228.    No documents attached to the Opposition established Palisades Collections' or Defendants' authority to execute on the judgment.

229.    Each of Bryks's representations in the Opposition was made without a reasonable basis and without having undertaken any investigation that could have led to a good faith belief in their truth.

230.    Defendants unduly prolonged the legal proceedings against Mr. Soto. On information and belief, Defendants did so to induce Mr. Soto to drop his challenge to the execution or enter into a settlement favorable to Defendants.

231.    *Asta v. Soto* was adjourned for a second court date.

232.    Between his first and second court dates, $641.28 remained restrained from Mr. Soto's bank account.

233.    Mr. Soto traveled to Bronx Civil Court to meet with CLARO. On or around November 29, 2018, Mr. Soto, with CLARO's assistance, prepared and served a *pro se* supplemental affidavit in support of his Motion to Vacate.

234.    The supplemental affidavit attached numerous documents proving that Mr. Soto did not live at the alleged service address, 3439 Knox, in December 2003, including: a paystub, his 2003 W-2, and court papers showing that as of October 2003, Mr. Soto was subject to a protective order limiting contact with his estranged wife, who lived at the alleged service address.

235.    On January 29, 2019, the second court date for Mr. Soto's motion, Mr. Soto represented by a limited-scope volunteer attorney through VLFD.

236.    On this date, the judge issued an order stating that Mr. Soto had "successfully challenged . . . service as alleged in the affidavit of service" and scheduling an evidentiary hearing on the issue of service for a third court date, March 12, 2019.

237.    On March 12, 2019, the third court date in *Asta v. Soto*, Mr. Soto appeared *pro se*. No one from H&A appeared for the evidentiary hearing. The judge vacated the *Asta v. Soto* judgment and dismissed the case with prejudice.

238.    As a result of Defendants' actions, Mr. Soto has experienced emotional and financial harm. Mr. Soto spent time and money to appear at multiple court dates and otherwise challenge the execution, including for postage, transportation, and photocopying, among other expenses. Mr. Soto had to miss work each time he attended court. Mr. Soto lost access to the

restrained funds for more than three months. Mr. Soto also experienced emotional distress; the sudden garnishment of his wages and the many court appearances placed him under considerable stress, which had negative effects on his health.

**Domingo Tolentino**

239.     Plaintiff Domingo Tolentino is a fifty-five year old resident of Teaneck, New Jersey. Mr. Tolentino works in building services at a hospital.

240.     On May 29, 2018, Mr. Tolentino received a Notice of Garnishment and income execution from New York City Marshal Ronald Moses.

241.     The documents stated that Mr. Tolentino owed $7,357.30, plus almost $9,000 in interest and fees, to satisfy a judgment in *Pinpoint Technologies, LLC v. Domingo A Tolentino* ("*Pinpoint v. Tolentino*"), Index Number 045890-05/BX, in New York City Civil Court, Bronx County.

242.     The income execution stated that the debt was owed to Libra Equities, LLC ("Libra"). The income execution was signed by Houslanger.

243.     Mr. Tolentino had never heard of *Pinpoint v. Tolentino*. He was never served with a summons and complaint in that action. He had no other notice of the action or the judgment, and never received an assignment of judgment, a change of attorney form, or a validation notice. Mr. Tolentino had never heard of Libra, Pinpoint Technologies, LLC ("Pinpoint"), or Defendants.

244.     Unbeknownst to Mr. Tolentino, Pinpoint had filed *Pinpoint v. Tolentino* against him on September 9, 2005, as an assignee of an alleged debt from Citibank.

245.     The law firm Mel S. Harris and Associates, LLC represented Pinpoint in *Pinpoint v. Tolentino*.

246.    On January 30, 2006, a default judgment was entered against Mr. Tolentino in the amount of $7,357.30.

247.    In support of its application for default judgment, Pinpoint submitted an affidavit of service in which process server Benjamin Lamb swore that he served Mr. Tolentino on September 16, 2005 at Mr. Tolentino's residence at 1666 Montgomery Avenue 1, Bronx, New York 10453 ("1666 Montgomery") by delivering the papers to a "Mr. Humberto Feliciano," a "Male with Black hair and Black skin, 21-35 years old, 5'4"-5'8", 1O [sic], wore glasses, had a beard, had a mustache."

248.    However, Mr. Tolentino does not know anyone with the name "Humberto Feliciano." Mr. Tolentino's appearance also does not match the appearance described for "Humberto Feliciano": his skin is light brown, he was 41 years old at the time of service, his hair was black and white, he did not wear glasses, and he did not have a beard. The only other people living with him around that time were his wife and daughter.

249.    The process server who claimed to have served Mr. Tolentino, Benjamin Lamb, was disciplined by the New York City Department of Consumer Affairs for violations of the regulations governing process servers, and fined for these violations.

250.    According to Defendants, the *Pinpoint v. Tolentino* judgment was sold from Pinpoint to Libra in 2014.

251.    No assignment of judgment was filed in *Pinpoint v. Tolentino*.

252.    On information and belief, Libra retained H&A to execute on the judgment.

253.    On May 23, 2018, Houslanger issued the income execution later received by Mr. Tolentino.

254.     On information and belief, before issuing the income execution neither Houslanger nor anyone at H&A possessed or reviewed the *Pinpoint v. Tolentino* judgment, affidavit of service, documents establishing a chain of title for the judgment, or the case file.

255.     On May 30, 2018, Mr. Tolentino filed a Motion to Vacate the *Pinpoint v. Tolentino* judgment. He also filed an affidavit stating that he "ha[d] not been served" in the action and that he found out about the case the day before. He further stated that he did "not owe[] money" and that he did "not recognize this debt." Mr. Tolentino could not review any documents in the court file because it was being held in the archive.

256.     On June 20, 2018, the first court date for Mr. Tolentino's motion, Bryks filed and served an Opposition to Mr. Tolentino's Motion, sworn under penalty of perjury.

257.     On information and belief, neither Bryks nor anyone at H&A possessed or reviewed the judgment, the affidavit of service, the documents establishing chain of title, or the case file in *Pinpoint v. Tolentino* prior to filing the Opposition.

258.     The Opposition did not attach the affidavit of service. In the Opposition, Bryks stated that "[a] copy of the Affidavit of Service is unavailable to be attached to this opposition." The Opposition did not contain any specific facts regarding service, such as how or when Mr. Tolentino was allegedly served.

259.     Nonetheless, in the Opposition, Bryks swore that "upon information and belief, [Mr. Tolentino] was properly served in this matter."

260.     This representation was false. Mr. Tolentino was never served.

261.     In the Opposition, Bryks stated that "[a] copy of the Judgment is unavailable to be attached to this opposition."

262.     Nonetheless, the Opposition stated that "[a]ny and all . . . garnishment of wages[] resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

263.     This representation was false. The judgment was not lawfully obtained, because Mr. Tolentino was never served. The execution was not proper, because, among other things, Defendants had no proof of the chain of title, and had not sent the required notices.

264.     The Opposition further stated that Libra was the "successor" to Pinpoint. In support of this statement, Bryks attached a notice of assignment signed by Michael Young indicating that the debt was owned by Libra.

265.     This document did not establish Libra's or Defendants' authority to execute on the judgment. *See In re Pinpoint Techs., LLC*, 5 N.Y.S.3d 329 (N.Y.C. Civ. Ct. 2014) (explaining that notices of assignment identical to the one submitted in *Pinpoint v. Tolentino* are invalid).

266.     Each of Bryks's representations in the Opposition was made without a reasonable basis and without having undertaken any investigation that could have led to a good faith belief in its truth.

267.     Defendants unduly prolonged the legal proceedings against Mr. Tolentino. On information and belief, Defendants did so to induce Mr. Tolentino to drop his challenge to the execution or enter a settlement favorable to Defendants.

268.     *Pinpoint v. Tolentino* was adjourned for a second court date. On this court date, and his subsequent court dates, Mr. Tolentino was represented by a limited-scope volunteer attorney through VLFD. On each of these court dates, H&A attempted to secure Mr. Tolentino's

agreement to pay money toward the purported debt in exchange for dismissal of the action, but Mr. Tolentino refused.

269.    On September 5, 2018, the second court date for Mr. Tolentino's motion, *Pinpoint v. Tolentino* was adjourned for a third court date.

270.    On January 29, 2019, the third court date for Mr. Tolentino's motion, *Pinpoint v. Tolentino* was adjourned for a fourth court date.

271.    On March 12, 2019, the fourth court date for Mr. Tolentino's motion, *Pinpoint v. Tolentino* was adjourned for a fifth court date.

272.    On May 2, 2019, the fifth court date for Mr. Tolentino's motion, Mr. Tolentino filed a supplemental affidavit that he prepared with the assistance of current counsel. The judge orally acknowledged that the supplemental affidavit rebutted the presumption of service and justified an evidentiary hearing. H&A thereafter agreed to stipulate to vacate the judgment, but did not agree to dismiss the case.

273.    Because the judgment was vacated, the case was returned to "active" status and adjourned for a sixth court date, which was scheduled for June 26, 2019.

274.    On June 3, 2019, H&A sent Mr. Tolentino a Stipulation containing the Release, *supra*, ¶ 133, and a letter stating:

> Enclosed please find three (3) copies of a Mutual Stipulation of Discontinuance and General Release in the above captioned matter. Due to the passage of time, we have decided to discontinue this matter. We wanted to advise you of this so that you may avoid the further inconvenience of coming to Court.

275.    Mr. Tolentino responded to H&A by sending a signed copy of the Stipulation in which he had crossed out the Release.

276.    On or around June 20, 2019, H&A sent Mr. Tolentino a new Stipulation that did not contain the Release. Mr. Tolentino signed this Stipulation. The Stipulation was submitted to

the court and *Pinpoint v. Tolentino* was dismissed.

277.     As a result of Defendants' actions, Mr. Tolentino has experienced emotional and financial harm. Mr. Tolentino spent time and money to appear at five court dates, to meet with CLARO, and to otherwise challenge the execution, including for postage and photocopying, among other expenses. Each time Mr. Tolentino had to come to Bronx Civil Court, he missed a day of work and had to use a vacation day. To get to Bronx Civil Court, he drove from New Jersey, and had to pay tolls and parking each time. Mr. Tolentino also experienced emotional distress; the sudden threat of garnishment of his wages and the many court appearances, spanning almost a year, placed him under substantial stress.

**Luis Viruet**

278.     Plaintiff Luis Viruet is a sixty-six year old resident of Brooklyn, New York. Mr. Viruet works in sales at a beverage company.

279.     On or after September 27, 2017, Mr. Viruet received a Notice of Garnishment and income execution from New York City Marshal Ronald Moses.

280.     The documents stated that Mr. Viruet owed $2,320.65, plus over $3,000 in interest and fees, to satisfy a judgment in *Platinum Financial Services Corporation v. Luis Viruet* ("*Platinum v. Viruet*"), Index Number 82607-02/KI, in New York City Civil Court, Kings County.

281.     The income execution stated that the debt was owed to Palisades Collection, LLC ("Palisades Collection"). The income execution was signed by Houslanger.

282.     Mr. Viruet had never heard of *Platinum v. Viruet*. He was never served with a summons and complaint in that action. He had no other notice of the action or the judgment, and never received an assignment of judgment, a change of attorney form, or a validation notice. Mr.

Viruet had never heard of Palisades Collection, Platinum Financial Services Corporation

("Platinum"), or Defendants.

283.    Unbeknownst to Mr. Viruet, Platinum had filed *Platinum v. Viruet* against him on

November 15, 2002, as an assignee of an alleged credit card debt from Providian Bank.

284.    The law firm Upton, Cohen, & Slamowitz represented Platinum in *Platinum v.

Viruet*.

285.    On April 4, 2003, a default judgment was entered against Mr. Viruet in the

amount of $2,268.65.

286.    In support of its application for default judgment, Platinum submitted an affidavit

of service in which process server Kenneth Sloman swore that he served Mr. Viruet on October

30, 2002, by handing the papers to "Rosa 'Doe,'" a "cotenant" of Mr. Viruet who "refused" to

give her last name, at Mr. Viruet's residence at 94 Ross Street, Apartment 6G, Brooklyn, New

York 11211, and mailing the summons and complaint to the same address. Sloman described

"Rosa" as a white female aged 36-50 years old, with black hair and glasses.

287.    Mr. Viruet was not served. He did not live with anyone named "Rosa" or anyone

matching the physical description of "Rosa."

288.    The process server who claimed to have served Mr. Viruet, Kenneth Sloman, was

disciplined by the New York City Department of Consumer Affairs for violations of the

regulations governing process servers. As a result of these violations, Mr. Sloman was required

to surrender his process serving license and is permanently banned from serving process in New

York City.

289.    According to Defendants, the judgment against Mr. Viruet was sold three times in

2007: from Platinum to Palisades Acquisition XV, LLC; from Palisades Acquisition XV, LLC to

Palisades Acquisition XVI, LLC; and from Palisades Acquisition XVI, LLC to Palisades Collection.

290.    No assignments of judgment were filed in *Platinum v. Viruet*.

291.    On information and belief, Palisades Collection retained H&A to execute on the judgment.

292.    On September 22, 2017, Houslanger issued the income execution later received by Mr. Viruet.

293.    The income execution stated the incorrect judgment amount.

294.    On information and belief, before issuing the income execution, neither Houslanger nor anyone at H&A possessed or reviewed the *Platinum v. Viruet* affidavit of service, documents establishing a chain of title for the judgment, or the case file.

295.    On October 6, 2017, Mr. Viruet filed in Kings Civil Court a *pro se* Motion to Vacate the *Platinum v. Viruet* judgment. On information and belief, he also filed an affidavit stating that he was never served and that he first learned of the lawsuit from the execution he recently received. His affidavit also stated: "I do not owe this debt. I never had this credit card." Mr. Viruet could not review any documents in the court file because it was being held in the archive.

296.    On October 27, 2017, the first court date for Mr. Viruet's motion, Bryks filed and served an Opposition to Mr. Viruet's Motion, sworn under penalty of perjury.

297.    On information and belief, neither Bryks nor anyone at H&A possessed or reviewed the affidavit of service, the documents establishing chain of title, or the case file in *Platinum v. Viruet* prior to filing the Opposition.

298.    The Opposition did not attach the affidavit of service. In the Opposition, Bryks

stated that "[a] copy of the Affidavit of Service is unavailable to be attached to this opposition." The Opposition did not contain any specific facts regarding service, such as how or when Mr. Viruet was allegedly served.

299.    Nonetheless, in the Opposition, Bryks stated that "[u]pon information and belief, [Mr. Viruet] was properly served in this matter."

300.    This representation was false. Mr. Viruet was never served.

301.    The Opposition stated that "[a]ny and all . . . garnishment of wages[] resulted from the proper execution of a judgment of this Court, lawfully obtained and issued therefrom."

302.    This representation was false. The judgment was not lawfully obtained, because Mr. Viruet was never served. The execution was not proper, because, among other things, Defendants had no proof of the chain of title, and had not sent the required notices.

303.    The Opposition further stated that Palisades Collection was the "successor" to Platinum. In support of this statement, Bryks attached, in the Opposition, three bills of sale: one dated March 5, 2007 from Platinum to Palisades Acquisition XV, another with the same date from Palisades Acquisition XV to Palisades Acquisition XVI, and a third on October 11, 2007 from Palisades XVI to Palisades Collection.

304.    The bills of sale did not establish that Palisades or Defendants had the authority to execute on the judgments. Among other problems, one bill of sale purports to transfer "Accounts" listed on a "Schedule" that is not provided; all three bills of sale are not signed by both parties; and the bill of sale purporting to assign the judgment from Palisades Acquisition XVI, LLC to Palisades Collection states that the "receivables" being assigned "were purchased by the Seller from Great Seneca Financial Corporation."

44

305.    Each of Bryks's representations in the Opposition was made without a reasonable basis and without having undertaken any investigation that could have led to a good faith belief in their truth.

306.    Defendants unduly prolonged the legal proceedings against Mr. Viruet. On information and belief, Defendants did so to induce Mr. Viruet to drop his challenge to the execution or enter into a settlement favorable to Defendants.

307.    Mr. Viruet was represented by a limited-scope volunteer attorney through VLFD at his first court date, as well as his subsequent court dates.

308.    *Platinum v. Viruet* was adjourned for a second court date.

309.    Mr. Viruet traveled to Kings Civil Court to meet with CLARO. On or around February 11, 2018, Mr. Viruet, with CLARO's assistance, filed and served a *pro se* supplemental affidavit in support of his Motion to Vacate.

310.    On February 14, 2018, the second court date for Mr. Viruet's motion, *Platinum v. Viruet* was adjourned for a third court date.

311.    On March 15, 2018, the third court date in *Platinum v. Viruet*, the judge granted Mr. Viruet's Motion to Vacate, finding that the Court "lack[ed] . . . personal jurisdiction" over Mr. Viruet because service was improper.

312.    As a result of Defendants' actions, Mr. Viruet has experienced emotional and financial harm. Mr. Viruet spent time and money to appear at multiple court dates and otherwise challenge the execution, including for postage, transportation, and photocopying, among other expenses. He missed five days of work to attend the court dates and to go to court to file documents, and had to take sick or vacation days. Mr. Viruet's wife missed three days of work to attend the court dates with him, and did not receive any payment for those days. Mr. Viruet also

experienced emotional distress; the sudden threat of wage garnishment and the many court

appearances, lasting over six months, placed him under substantial stress. Mr. Viruet lost sleep

over the ordeal and often thought about it while doing everyday activities.

## **CLASS ACTION ALLEGATIONS**

313.    Named Plaintiffs bring this action, pursuant to Rules 23(a), (b)(2) and (b)(3) of

the Federal Rules of Civil Procedure, on behalf of themselves and as representatives of a Class

consisting of:

> All individuals against whom Defendants executed on a judgment obtained in
> New York City Civil Court on behalf of a judgment creditor that did not
> originally obtain the judgment.

314.    This is the same putative class on whose behalf the Original Proposed Class

Representatives sought relief in the previously-filed action, *Burkett v. Houslanger & Associates*,

No. 19 Civ. 2285 (LDH)(JO) (E.D.N.Y.).

315.    The class is so numerous that joinder of all Class Members in this action would be

impracticable.

316.    Defendants attempt to collect debts from 5,000 New York City consumers per

year. On information and belief, Defendants execute against a substantial portion of these

consumers on judgments obtained by judgment creditors that did not originally obtain the

judgments.

317.    On information and belief, approximately a dozen consumers file Motions to

Vacate such judgments each month.

318.    The precise number and identity of Class Members is contained within

Defendants' business and litigation records.

319.    Defendants have acted and continue to act in a similar manner toward to each member of the Class, thereby making appropriate final declaratory and injunctive relief with respect to the Class as a whole.

320.    Class members present common questions of law and fact and these questions predominate over any individual questions.

321.    The common questions of fact include, but are not limited to: what review, if any, Defendants conducted before issuing wage garnishments and bank restraints; what review, if any, Defendants conducted before opposing Motions to Vacate; whether Defendants prolonged legal proceedings in bad faith; and whether Defendants made false statements in court filings.

322.    The common questions of law include, but are not limited to: whether Defendants conducted meaningful review before issuing wage garnishments and bank restraints; whether Defendants conducted meaningful review before opposing Motions to Vacate; and whether Defendants' collection practices are unfair, deceptive, or misleading in violation of the FDCPA, the New York G.B.L. § 349, and the New York Judiciary Law.

323.    The claims of the Named Plaintiffs are typical of the claims of the Class. Defendants executed against Named Plaintiffs and Class Members on behalf of judgment buyers and acted in the same manner toward the Class as a whole, including by: preparing and issuing nearly identical form execution documents; preparing and filing nearly identical form oppositions to Motions to Vacate; and preparing and sending form Releases.

324.    The Named Plaintiffs will adequately and fairly protect the interests of all members of the proposed Class because they have the requisite personal interest in the outcome of this litigation and have no interest antagonistic to any member of the proposed Class.

325.     The Named Plaintiffs are represented by the New York Legal Assistance Group ("NYLAG"). Attorneys at NYLAG are experienced in complex federal litigation, class action litigation, and consumer defense litigation. Attorneys at NYLAG represented the Original Proposed Class Representatives and the putative class in the previously-filed action, *Burkett v. Houslanger & Associates*, No. 19 Civ. 2285 (LDH)(JO) (E.D.N.Y.).

326.     A class action is the superior method for a fair and efficient adjudication of this matter in that Defendants have acted in the same manner toward the Class as a whole and a class action will avoid numerous separate actions by Class Members that would unduly burden the courts and create the possibility of inconsistent decisions. Final injunctive and declaratory relief is thus appropriate as to the Class as a whole.

327.     Moreover, it would be impracticable for Class Members, who are, on information and belief, primarily low-income individuals, to obtain legal counsel on an individual basis to bring claims of the type raised in this action. Hence their rights under the law may well be meaningless without certification of a class action seeking common redress.

## **FIRST CAUSE OF ACTION**
Violation of the FDCPA, 15 U.S.C. §§ 1629e, 1692f, 1692g
Against All Defendants

328.     The FDCPA, 15 U.S.C. § 1692e, prohibits a debt collector from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt."

329.     The FDCPA, 15 U.S.C. § 1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

330.     The FDCPA, 15 U.S.C. § 1692g, requires that "[w]ithin five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector

shall . . . send the consumer a written notice containing," among other things, a statement of the consumer's right to dispute the debt and to obtain the name and address of the original creditor.

331.     Defendants violated the FDCPA, §§ 1692e, 1692f, 1692g, by making false, deceptive, and misleading representations, engaging in unfair and unconscionable practices, and failing to send required notices. Defendants' violations included, but were not limited to:

a.  Threatening to execute on, and executing on, invalid judgments;

b.  Executing on judgments against Class Members without undertaking a meaningful attorney review of the case;

c.  Executing on judgments against Class Members without filing and serving an assignment of judgment;

d.  Executing on judgments against Class Members without filing and serving a change of attorney form;

e.  Failing to send a validation notice;

f.  Filing Oppositions to Class Members' Motions to Vacate without undertaking a meaningful attorney review of the case;

g.  Making false and misleading statements, including in Oppositions to Class Members' Motions to Vacate;

h.  In bad faith, unduly prolonging legal proceedings and requiring Class Members to appear at unnecessary court dates; and

i.  Seeking Releases from Class Members to insulate themselves from liability from unlawful actions.

332.     Defendants' wrongful and deceptive acts have caused injury and damages to Named Plaintiffs and putative Class Members and unless enjoined, will cause further irreparable injury.

333.     As a direct and proximate result of Defendants' violations, Named Plaintiffs and Class Members have suffered compensable harm and are entitled to recover actual and statutory damages, costs, and attorneys' fees.

## SECOND CAUSE OF ACTION
### Violation of N.Y. Gen. Bus. § 349
### Against All Defendants

334.    New York General Business Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business . . . in this state" and provides that "any person who has been injured by reason of any violation of this section may bring an action in his own name" for injunctive relief, damages, and attorneys' fees.

335.    Defendants violated N.Y. Gen. Bus. § 349 by engaging in deceptive acts and practices in the conduct of their business. Defendants' violations included, but were not limited to:

a.  Threatening to execute on, and executing on, invalid judgments;

b.  Executing on judgments against Class Members without undertaking a meaningful attorney review of the case;

c.  Executing on judgments against Class Members without filing and serving an assignment of judgment;

d.  Executing on judgments against Class Members without filing and serving a change of attorney form;

e.  Failing to send a validation notice;

f.  Filing Oppositions to Class Members' Motions to Vacate without undertaking a meaningful attorney review of the case;

g.  Making false and misleading statements, including in Oppositions to Class Members' Motions to Vacate;

h.  In bad faith, unduly prolonging legal proceedings and requiring Class Members to appear at unnecessary court dates; and

i.  Seeking Releases from Class Members to insulate themselves from liability from unlawful actions.

336.    Defendants' actions were consumer oriented and had a broad impact on New York consumers at large. Indicia that Defendants' actions were consumer-oriented include, but are not limited to, the fact that Defendants' actions as to the Named Plaintiffs were nearly identical to their actions as to the Original Proposed Class Representatives, as well as other Class Members.

337.   Defendants committed the above-described acts willfully and/or knowingly.

338.   Defendants' wrongful and deceptive acts have caused injury and damages to Named Plaintiffs and putative Class Members and unless enjoined, will cause further irreparable injury.

339.   As a direct and proximate result of Defendants' violations, Named Plaintiffs and putative Class Members have suffered compensable harm and are entitled to recover actual and treble damages, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
Violation of N.Y. Jud. Law § 487
Against Defendants Houslanger and Bryks

340.   New York Judiciary Law § 487 states that "[a]n attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . is guilty of misdemeanor [and] . . . forfeits to the party injured treble damages, to be recovered in a civil action."

341.   Defendants violated New York Judiciary Law § 487 by engaging in deceit or collusion, or consenting to deceit or collusion, with the intent to deceive courts and opposing parties. Defendants' violations included, but were not limited to:

   a.   Threatening to execute on, and executing on, invalid judgments;
   b.   Executing on judgments against Class Members without undertaking a meaningful attorney review of the case;
   c.   Executing on judgments against Class Members without filing and serving an assignment of judgment;
   d.   Executing on judgments against Class Members without filing and serving a change of attorney form;
   e.   Failing to send a validation notice;
   f.   Filing Oppositions to Class Members' Motions to Vacate without undertaking a meaningful attorney review of the case;
   g.   Making false and misleading statements, including in Oppositions to Class Members' Motions to Vacate;

h.   In bad faith, unduly prolonging legal proceedings and requiring Class Members to appear at unnecessary court dates; and

i.   Seeking Releases from Class Members to insulate themselves from liability from unlawful actions.

342.   Defendants' conduct constituted a chronic pattern of extreme and egregious deceit.

343.   Defendants committed the above-described acts willfully and/or knowingly. Indicia that Defendants' actions were committed willfully and/or knowingly include, but are not limited to, the fact that Defendants' actions as to the Named Plaintiffs were nearly identical to their actions as to the Original Proposed Class Representatives, as well as other Class Members.

344.   Defendants' wrongful and deceptive acts have caused injury and damages to Named Plaintiffs and putative Class Members and unless enjoined, will cause further irreparable injury.

345.    As a direct and proximate result of these violations of New York Judiciary Law § 487, Named Plaintiffs and putative Class Members have suffered compensable harm and are entitled to recover actual and treble damages.


WHEREFORE, Named Plaintiffs request that this Court enter judgment jointly and severally as against all Defendants:

a.   Certifying this case as a class action, pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, with a Class defined as:

All individuals against whom Defendants executed on a judgment obtained in New York City Civil Court on behalf of a judgment creditor that did not originally obtain the judgment.

b.   Declaring that Defendants have committed the violations of law alleged in this action;

c.  Enjoining and directing all Defendants to cease engaging in debt collection practices that violate the FDCPA; New York General Business Law § 349; and New York Judiciary Law § 487;

d.  Awarding to Named Plaintiffs and the putative Class:

  i.  actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

  ii.  statutory damages pursuant to the FDCPA;

  iii.  treble damages pursuant to N.Y. G.B.L. § 349(h) and N.Y. Jud. Law § 487;

  iv.  disbursements, costs, and attorneys' fees pursuant to the FDCPA and N.Y. G.B.L. § 349; and

e.  Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Named Plaintiffs demand a trial by jury on all issues triable by a jury.

Dated:  November 26, 2019
New York, New York


Respectfully submitted,

Beth E. Goldman, Esq.
New York Legal Assistance Group
7 Hanover Square
New York, NY 10004
(212) 613-5000

By:

_____
Danielle Tarantolo, of counsel
Jane Greengold Stevens, of counsel
Jessica Ranucci, of counsel
(212) 613-6551
dtarantolo@nylag.org

*Counsel for Plaintiffs*

54